LOUIS PAOLINO and
MARIE ISSA,
      Plaintiffs,

      v.                           C.A. No. 12-039-ML

JF REALTY, LLC, JOSEPH I. FERREIRA,
ROBERT YABROUDY[1], LKQ ROUTE 16
USED AUTO PARTS, INC., DBA
ADVANCED AUTO RECYCLING,
JOSEPH I. FERREIRA TRUST,
      Defendants.


**MEMORANDUM OF DECISION**

    This case, a citizen enforcement action under the Clean Water Act ("CWA"), 33 U.S.C. § 1251 *et seq*. (1972), is the culmination of a longstanding and bitter dispute between neighbors. The plaintiffs, Louis Paolino ("Paolino") and his wife, Marie Issa ("Issa", together with Paolino, the "Plaintiffs"), own a parcel of property (the "Paolino Property") which abuts a 39-acre site (the "Property") in Cumberland, Rhode Island, that is owned by the defendants JF Realty, LLC, ("JF Realty") and operated as an automobile recycling business by LKQ Route 16 Used Auto Parts, Inc., d/b/a Advanced Auto Recycling ("LKQ"). Both properties are part of a former pig farm and

---

[1]     Defendant Robert Yabroudy ("Yabroudy"), who functioned as treasurer of JF Realty and the Trust, was dismissed from the case for defective notice.

illegal dump site, as a result of which they have a history of significant environmental contamination. The other named defendant is Joseph I. Ferreira ("Ferreira," together with JF Realty and LKQ, the "Defendants"), who is sued both in his individual capacity and as the trustee of the Joseph I. Ferreira Trust (the "Trust"). Ferreira, who acquired the Property in 1983, is the only member of JF Realty.

The Plaintiffs bought the Paolino Property[2] in December 1985, approximately a year after Ferreira had begun to use the abutting 39-acre Property for an automobile salvage business. According to the Complaint, the Defendants lack a valid Rhode Island Pollutant Discharge Elimination System ("RIPDES") permit issued in the Property owner's and/or operator's name, Complaint ¶¶ 56-59; contaminated stormwater runoff is being discharged from the Property into United States waters, resulting in violations of the CWA, Complaint ¶ 1; and the improper treatment of such stormwater on the Property has also led to contamination on the Paolino Property. Complaint ¶ 46.

After years of litigation in both state and federal courts,

---

[2] Over the course of litigation, the six-acre Paolino Property was subdivided into three parcels; two half-acre parcels were sold and residential homes were constructed thereon. Only the remaining five-acre vacant parcel directly abutting the Property is at issue in this litigation. Any claims related to the two smaller parcels were dismissed by the Plaintiffs, with prejudice, in a related state court action.

the parties presented their respective positions to this Court in a seven-day trial without a jury.[3] After reviewing all the evidence presented in this case, the matter is now ready for a determination.

## I. Procedural History

The underlying facts and the lengthy and complicated procedural history of this case have been repeatedly related in some detail, see e.g., Paolino v. JF Realty, 710 F.3d 31, 35-37 (1st Cir. 2013); Paolino v. JF Realty, C.A. No. 12-39-ML, 2012 WL 3061594 (D.R.I. July 26, 2012); LM Nursing Service, Inc. v. Ferreira, No. 09-cv-413-SJM-DLM, 2011 WL 1222894 (D.R.I. Mar. 30, 2011). Therefore, the Court will only highlight some of the events pertinent to the current posture of the case.

This is the third time the Plaintiffs have filed a citizen suit under the CWA against the Defendants. The first complaint was filed in 2006 in Rhode Island state court and removed to this Court on September 4, 2009, after the Plaintiffs' fourth amendment to their state court complaint included claims under various federal environmental statutes. On March 30, 2011, that complaint was dismissed, in part, for lack of proper notice, and all state claims were remanded to state court. LM Nursing

---

[3]
    The Defendants' motion to strike the Plaintiffs' jury demand was granted on August 8, 2013. (Dkt. No. 33).

Service, Inc. v. Ferreira, No. 09-cv-413-SJM-DLM, 2011 WL 1222894 (D.R.I. Mar. 30, 2011). The Plaintiffs filed a complaint in this Court on June 6, 2011, which the Court dismissed without prejudice in August 2011, pursuant to the parties' stipulation of dismissal. On January 20, 2012, the Plaintiff filed the instant Complaint.

The Court dismissed the Complaint on July 26, 2012 for defective pre-suit notice, see Paolino v. JF Realty, C.A. No. 12-39-ML, 2012 WL 3061594 (D.R.I. July 26, 2012); the dismissal was subsequently reversed by the First Circuit Court of Appeals on March 13, 2013. Paolino v. JF Realty, 710 F.3d 31, 35-37 (1st Cir. 2013). However, the dismissal of all claims against Robert Yabroudy, Ferreira's business manager, for lack of proper notice was upheld. Id.

After the case was remanded, the Court issued a pretrial order, pursuant to which Plaintiffs' expert witnesses and their reports were to be disclosed by February 28, 2014; all expert discovery was to be closed by May 30, 2014. (Defendants' expert witness disclosures were due by March 31, 2014.)(Dkt. No. 23).

On May 31, 2013, the Plaintiffs sought recusal of the undersigned for a variety of reasons (Dkt. No. 21); the Court, finding no merit in any of those asserted reasons, denied the motion on June 25, 2013. Paolino v. JF Realty, C.A. No. 12-39-ML,

4

2013 WL 3233296 (D.R.I. June 25, 2013). The Defendants'
subsequent motion to dismiss all claims against Ferreira was
denied on July 24, 2013. Paolino v. JF Realty, C.A. No. 12-39-ML,
2013 WL 3867376 (D.R.I. July 24, 2013). On August 8, 2013, the
Court granted the Defendants' motion to strike the Plaintiffs'
jury demand. (Dkt. No. 33).

The parties then engaged in, at times, contentious
discovery. See, e.g. Memorandum and Order dated July 2, 2014
(Dkt. No. 73), denying as untimely Plaintiffs' motion for leave
to compel production of documents (Dkt. No. 46) and motions to
compel answers to interrogatories and production of documents
(Dkt. Nos. 44, 45).

On February 19, 2014, the Plaintiffs sought an order
compelling the Defendants to allow the Plaintiffs, their
attorneys, and their expert witness to inspect the Property on
the ground that "Plaintiffs' expert witness needs to conduct this
inspection to assist in formulating his opinion." (Dkt. No. 38).
The Defendants objected to Plaintiffs' motion, noting that, on
December 24, 2013, Plaintiffs had served a request for entry upon
land in which they sought to inspect the entire 39-acre Property,
including the interiors of all buildings. (Dkt. No. 40 at 2).
According to the Defendants, they indicated to the Plaintiffs
that they did not object to an inspection altogether, and they

asked the Plaintiffs to narrow the scope of their request and identify the purpose for which the request was made. Id. The Plaintiffs renewed their request on January 17, 2014, again seeking to inspect the land and the interior of the structures, which resulted in further correspondence from the Defendants requesting the Plaintiffs to narrow their request. Id. at 3.

The Plaintiffs' motion was granted, in part, on April 7, 2014, pursuant to which the Plaintiffs, their attorneys, and no more than two consultants were permitted to enter the Property for up to three hours.  In addition, one of Plaintiffs' attorneys and one consultant were permitted to enter the interior of certain structures on the property. Order dated April 7, 2014 (Dkt. No. 43). In the interim, on March 28, 2014, the Defendants sought a 30-day extension for their expert disclosures, which was granted. (Dkt. No. 42, Text Order March 31, 2014).

On June 13, 2014 (the deadline for the filing of dispositive motions), at 4:41 p.m., the Defendants filed a motion for summary judgment (Dkt. No. 49). On the same day, at 4:50 p.m., shortly after the Defendants filed their motion for summary judgment, the Plaintiffs filed a motion for leave to serve a revised expert report, (Dkt. No. 50), on the grounds that the Plaintiffs had not been able to gain entry to the Property until April 28, 2014 (following the Plaintiffs' motion to compel such access, filed on

February 19, 2014).

The Defendants objected to this request on June 30, 2014 (Dkt. No. 56), together with a motion to (1) strike the Plaintiffs' supplemental expert report, and (2) preclude Plaintiffs' expert, Dr. Robert M. Roseen ("Dr. Roseen") from offering testimony in opposition to the motion for summary judgment or at trial. (Dkt. No. 57). The Defendants noted that, on February 28, 2014, the deadline for the Plaintiffs' expert disclosures, the Plaintiffs provided disclosures for two expert witnesses, Dr. Roseen and Alvin J. Snyder III ("Snyder"). The expert report submitted by Dr. Roseen at that time was "skeletal" and "non-substantive," and parts of it were marked as "DRAFT." Notwithstanding these obvious shortcomings, the Plaintiffs did not seek to supplement Dr. Roseen's report until June 13, 2014, more than three months after the Plaintiffs' expert disclosures were due, two weeks after expert discovery had closed, and after the Defendants had filed their motion for summary judgment, based, in part, on the information disclosed in Dr. Roseen's expert report. Defs.' Mem. at 1, 2 (Dkt. No. 58). As noted by the Defendants, Dr. Roseen was deposed on May 22, 2014, without any indication from the Plaintiffs that Dr. Roseen would be revising and/or supplementing his report. Id. at 4.

On their part, the Plaintiffs filed a pretrial memorandum on

June 27, 2014 (Dkt. No. 55) and an objection to the Defendants' motion for summary judgment on June 30, 2014 (Dkt. No. 56). In light of the voluminous materials submitted by both parties in support of their respective positions, the Court, following a conference with the parties on July 23, 2014, scheduled commencement of a trial without a jury for Monday, August 4, 2014. (Dkt. No. 83).

Prior to trial, the Defendants renewed their request, styled as a motion *in limine*, to dismiss the Plaintiffs' CWA claim on the ground that the claim had already been dismissed with prejudice in the related state court action. (Dkt. No. 89). No decision was rendered on that motion before trial. The first three days of trial took place on August 4, 5, and 6, 2014; the remainder was continued until September 8, 2014 in order to accommodate Plaintiffs' expert witness, Dr. Roseen.

Following presentation of the Plaintiffs' case, the Defendants made a motion for judgment on partial findings pursuant to Fed. R. Civ. P. 52(c), which the Court took under advisement. The Defendants renewed their motion after the close of all evidence. As directed by the Court, the Defendants filed a post-trial memorandum on October 3, 2014 (Dkt. No. 98); the Plaintiffs submitted their memorandum on October 24, 2014 (Dkt. No. 107).

## II. Standard of Review

Federal Rule 52(a)(1) provides that "[i]n an action tried on the facts without a jury or with an advisory jury, the court must find the facts specially and state its conclusions of law separately. The findings and conclusions may be stated on the record after the close of the evidence or may appear in an opinion or a memorandum of decision filed by the court. Judgment must be entered under Rule 58." Fed. R. Civ. P. 52(a)(1).

As explained by the First Circuit Court of Appeals, "Rule 52(a)(1) is designed to ensure not only that the parties are adequately apprised of the district court's findings and rationale but also that a reviewing court will thereafter be able to evaluate the bona fides of the district court's decision." Valsamis v. Gonzalez-Romero, 748 F.3d 61, 63 (1st Cir. 2014). The directive of Rule 52(a) "'impose[s] on the trial court an obligation to ensure that its *ratio decidendi* is set forth with enough clarity to enable a reviewing court reliably to perform its function.'" Sierra Fria Corp. v. Donald J. Evans, P.C., 127 F.3d 175, 180 (1st Cir. 1997)(quoting Touch v. Master Unit Die Prods., Inc., 43 F.3d 754, 759 (1st Cir. 1995)).

The following constitutes the Court's findings of facts and conclusions of law after considering all the testimony and evidence introduced by the parties in the course of the trial.

## III. Findings of Fact

The Plaintiffs introduced the testimony of ten witnesses, including that of Paolino and Ferreira. The Defendants introduced the testimony of four witnesses, including that of Yabroudy, who was also called to testify in the Plaintiffs' case. The evidence is summarized and evaluated in the order it was presented.

### 1. Christopher Lee

Field technician Christopher Lee ("Lee"), employed by Rhode Island Analytical Laboratories, took water samples at the Paolino Property on December 23, 2013.  TR I, 8:15-23. The Paolino Property is a vacant, wooded five-acre parcel facing Curran Road in Cumberland; it is immediately adjacent to the 39-acre Property where the auto salvage business is located. TR I, 9:13-10:3.  Lee described a rock-lined drainage channel parallel to Curran Road, which was fed by multiple sources and emptied into a culvert under the road. TR I, 11-17. According to Lee, he observed water flowing from the smaller of two pipes set in a stone wall on the Property. TR I, 10:9-24. Lee observed that the water had a rainbow-like sheen, Tr I, 11:1-2. Lee also observed an intermittent stream[4] running parallel to the property line between the Paolino Property and the Property and perpendicular

_____

[4]

The intermittent stream is also known as Curran Brook and runs on the Paolino Property from a pond in the rear portion of that property. TR I, 74:17-75:2.

10

to Curran Road. TR I, 23:9-17. During his twenty-minute visit to the site, Lee did not observe the corrugated metal pipe sticking into the drainage channel; however, it was later established that the metal pipe directing Curran Road runoff, the intermittent stream, and both outfalls from the Property all feed into the drainage channel. Lee's testimony established that he took a single sample from the drainage channel located partially on the Paolino Property; he took no samples from the smaller outflow pipe located on the Property. TR I, 26:1-6.

### 2. Alvin J. Snyder

Alvin Snyder ("Snyder") is a registered professional engineer and the principal of Environmental Resource Associates, Inc., a company engaged in environmental compliance and remediation. TR I, 29:8-17. Snyder was contacted by Paolino on December 23, 2013, after which Snyder requested that Rhode Island Analytical send a field technician (Lee) to the Paolino Property and take a water sample. TR I, 32:8-33:13. Snyder later received a report from Rhode Island Analytical that contained an analysis of the sample, Lee's field observations, and several photographs. TR I. 33:16-25. Snyder returned to the Paolino Property on December 29, 2013 after a rainfall. TR I 38:13-39:2. On that occasion, Snyder observed that the drainage ditch was flowing and that both LKQ outflow pipes were flowing, as was the metal pipe

that was draining storm water from Curran Road. TR I, 39:6-12.
Snyder took several samples, all on the Paolino Property. TR I,
22-24. No samples were taken from the two outflow pipes located
on the Property. According to Snyder, he had previously taken
samples in December 2009, both within the channel on the Paolino
Property and in the intermittent stream. TR I, 52:7-24. Again, no
samples were taken from the LKQ outflow pipes.

Likewise, when Snyder visited the Paolino Property on June
25, 2010 after a rain storm, he took soil samples within the
drainage channel only, TR I, 67:23-68:11, as he did in September
of 2011. TR. I, 71:23-72:9. No samples were taken on the
Property. TR I, 81:6-11.

From the combined testimony of Lee and Snyder, it was
established that the drainage channel, or "swale," was fed by
five separate sources: (1) the intermittent stream on the Paolino
Property; (2) and (3) the two pipes in the headwall on the LKQ
site (the Property); (4) the swale on one side of Curran Road
(located upstream of the two headwall pipes, TR I, 91:10-16); and
(5) the storm drain on the other side of Curran Road, connected
to the drainage area by pipe. TR I, 85:13-87:7. In other words,
water from Curran Road flowed through the swale, mixed with LKQ
water, mixed with the intermittent stream, and mixed with water
from the stormwater drain across from Curran Road, after which

everything flowed through the drainage area under Curran Road. Any water samples that Snyder took in December 2009 after a rainstorm were taken in the intermittent stream or in the drainage channel, without sampling separately from the individual sources that contributed to the flow in the drainage area. Most significantly, no samples were taken from the two outflow pipes located on the Property. The same type of undifferentiated sampling was undertaken by Snyder in September 2011. TR I, 109:24-112:12. According to Snyder, he "made the assumption the water flowing into the swale would be the same as what was coming out the drain pipes from the same road." TR I, 114:13-22.

Snyder acknowledged that samples taken from the Paolino Property along Curran Brook in 2009 revealed the presence of TPH (Total Petroleum Hydrocarbons). TR I 106:17-107:9. Snyder, who also testified in the state proceedings brought by Paolino against the Defendants, further acknowledged that (1) TPH was found on multiple locations on the Paolino Property; (2) Paolino had been ordered by RIDEM to remove some 1,100 tons of contaminated soil; and (3) the stream bed on Paolino's property was contaminated with lead, oil, sediment, and debris. TR I, 107:7-109:2. Snyder also conceded that the only place where he believed that stormwater from the Property touches the Paolino Property is at the culvert right next to Curran Road. TR I,

109:14-23. Subsequent testimony from RIDEM staff indicated, however, that this area may be part of the Curran Road right-of-way, not on Paolino's property.

### 3. Harold Ellis

Harold Ellis ("Ellis") is a former supervising environmental scientist with RIDEM. Because Ellis's proposed testimony related primarily to events dating back thirty or more years before the Complaint (which seeks, *inter alia*, injunctive relief as a remedy) was filed, no additional facts relevant to the case were established by his testimony.

### 4. Louis R. Maccarone II

Louis R. Maccarone II ("Maccarone") is a senior sanitary engineer at the RIDEM Office of Waste Management, which handles Superfund sites and site remediations. TR I, 140:14-25. On October 5, 2005, Maccarone sent a letter of responsibility ("LOR") to the Ferreira Trust. Ex. 53. The LOR references various documents concerning site assessments and inspections of a site identified as the "Boulter Farm." Ex. 53 at 1. According to the LOR, RIDEM has a file on that site that identifies elevated concentrations of certain contaminants. The LOR advised the Trust, as then current owner of the Property, and Advanced Auto Recycling, as then current operator of the Property, that both were considered a "Responsible Party" under RIDEM Remediation

Regulations, and it required them to conduct a full site investigation, submit a completed site investigation report, and bring the Property into compliance with the regulations. Ex. 53 at 2-3.

Maccarone was unclear as to whether the Trust ever submitted a site investigation report, TR 145:1-7. He did not believe that any requested sampling at the boundary line had been done, and he noted that he was unaware of any time limits with respect to compliance with the LOR. TR I, 146:1-17. As was established in the course of Maccarone's testimony, his department was not responsible for stormwater treatment plans, TR I, 149:12-20, and the contaminants referenced in the 2005 LOR were found ten or twelve feet down in the soil, and not related to surface water. TR I, 151:14-21. Accordingly, Maccarone's testimony provided no additional facts relevant to the Plaintiffs' case.

### 5. David D. Chopy

David D. Chopy, ("Chopy"), RIDEM's Chief of Compliance and Inspection, identified e-mail correspondence between Chopy and an individual at the EPA (Environmental Protection Agency), in which Chopy confirmed that he had received certain data from Snyder regarding stormwater discharge samples taken on February 11, 2010. Ex. 48, TR II, 6:21-7:2. Chopy acknowledged that the data appeared to demonstrate water quality violations but he noted

that because "[t]he data was obtained by a consultant working on the behalf of Mr. Paolino... we cannot use it in an enforcement action and there is nothing more that we can do at this time beyond what we have already done (i.e. issue a formal enforcement action requiring corrective action)." Ex. 48. Chopy also noted that "[t]he case is pending a hearing at the DEM Adjudication Division." Id. Chopy provided no further substantive testimony.

### 6. Louis Paolino

Paolino recounted that he stopped by the drainage area on December 23, 2013, and observed an oil sheen coming from the smaller pipe in the headwall located on the Property. Paolino notified RIDEM and called Snyder to make arrangements to test for oil. TR II, 12:18-13:23. Later that day, Paolino returned to the area and observed an individual sweeping what Paolino believed to be sediment and oil through the culvert. TR II 16:19-17:3.

Paolino again visited the site on April 15, 2014. According to Paolino, he noticed a lot of turbidity (cloudiness in the water) coming from the larger of the two outfall pipes in the headwall; Paolino took a picture on that occasion. TR II, 18:23; Ex. 23. Referencing the trespass claim tried in state court in 2012, Paolino pointed out that a portion of the headwall was

built on his property. Ex. 16.[5] Paolino conceded, however, that

he does not use the area in the vicinity of the intermittent

stream and the discharge channel for anything. TR II, 25:7-23.

Paolino recalled that he had at least one conversation with

Ferreira between 1987 and 1989, in which he asked Ferreira to

remove a number of auto parts from the Paolino Property. TR II,

38:7-18.

After purchasing the Paolino Property in 1985 for $40,000,

Paolino only visited it once or twice a year. Paolino also

declared that, during that time, he was unaware of the automobile

salvage yard operating next door. TR II, 40:3-12. In the early

2000s, Paolino entered into an agreement to sell his property for

development. TR II, 40:13-22. Subsequently, Paolino was sued by

the developer for failing to disclose that the Paolino Property

was contaminated.[6] TR II, 42:1-44:25. Paolino acknowledged that

---

[5]

    Exhibit 16, a jury verdict summary sheet from Paolino's case
against the Defendants in state court, indicates that the jury
awarded $250 in nominal damages to Paolino for the encroachment of
a portion of JF Realty's stormwater remediation system onto the
Paolino Property. Ex. 16, ¶ 17.

[6]

    Paolino's statements in that regard cast some doubt on the
reliability of his testimony when he insisted that he had not been
sued by the developer, a position he also maintained in a prior
iteration of this case. TR II, 42:1-43:17. When confronted with a
copy of the complaint against him, Paolino explained that, although
he answered the complaint and related interrogatories, he "never
considered this a lawsuit." TR, II 44:8-22.

he sought a tax abatement in 2003 because of the contamination found on his property. TR II, 47:12-14. Paolino was directed to undertake remediation, for which he hired the engineering firm GZA, which excavated more than 1,100 tons of soil contaminated with TPH and MTBE (Methyl Tertiary Butyl Ether). TR II, 47:15-48:1. Paolino also acknowledged that the remediation project on his property was still an open site for RIDEM. TR II, 48:2-51:3.

In 2006, Paolino told Yabroudy that he wanted Ferreira to purchase the Paolino Property for $250,000. TR II, 51 13-23. Ferreira declined the offer. At the end of 2006, Paolino filed the first lawsuit against the Defendants and a number of entities whom he considered responsible for the contamination on the Paolino Property. TR II, 53:15-54:14. In addition, Paolino made numerous complaints about the Property to RIDEM, EPA, the Cumberland Police Department, the U.S. Attorney's Office, DBR (Department of Business Regulations), and U.S. Senator Sheldon Whitehouse; Paolino also gave interviews to TV stations and he appeared on a radio talk show to discuss the matter. TR II, 56:21-58:6.

Paolino conceded, albeit reluctantly, that RIDEM had investigated a number of his complaints about the Property and had found them to be without merit. TR II, 59:12-66:14. *Inter alia*, RIDEM informed Paolino in April 2008 that it had

18

investigated three separate complaints by Paolino about conditions on the Property by performing a multimedia inspection in March 2008. TR II, 60:9-61:19. RIDEM noted that it had issued an NOI ("Notice of Intent to Enforce") to the owner of the Property related to turbid water discharge and some petroleum staining. TR II, 61:20-24. With regard to Paolino's complaint about rock and debris being thrown into the intermittent stream, RIDEM noted that riprap (processed rock) had been installed in and along the sides of the stream "in accordance with plans approved by the DEM Freshwater Wetlands Program on July 13, 2007." TR II, 63:3-13. RIDEM also found no evidence of a violation with respect to Paolino's claims that (1) solid waste in the wetlands on the Property had not been removed, TR II, 63:14-64:3; (2) water was being discharged onto the Paolino Property without permission or prior notice, TR II, 64:4-21; (3) a building had been constructed and expanded within the 100-foot riverbank wetland. TR II, 64:25-65:20; and (4) the auto recycling facility was mismanaging auto fluids and allowing liquid waste to run off into the wetlands. TR II, 65:22-66:14. RIDEM also pointed out to Paolino that it had already addressed the results of an earlier investigation in a letter to Paolino dated October 24, 2007. TR II, 65:25-65:20.

Further communication from RIDEM to Paolino's attorney in

November 2009 responded to Paolino's complaints about relocation of a stream, encroachment into a buffer zone, and allegations of continuing water pollution from the Property. TR II, 68:14-69:16. Paolino also complained to town officials about the installation of the swale along Curran Road without permits. In response, RIDEM informed the Cumberland Town Solicitor that it had received numerous, repeated complaints from Paolino regarding the Property and that it had "thoroughly investigated each complaint and determined all but one to be unfounded." TR II, 73:2-9. With regard to the single documented water pollution violation involving the discharge of turbid stormwater runoff from the Property to Curran Brook, RIDEM noted that it had issued a notice of violation on March 2, 2010, which included an order to correct the violation and an administrative penalty for noncompliance. TR II, 73:12-20.

Following Paolino's report of a discharge of oil and gasoline into the Pawtucket watershed to RIDEM on December 23, 2013, John P. Leo ("Leo") from RIDEM investigated the complaint. Ex. 21. Leo visited the Property and met with an inspector from the Pawtucket Reservoir and with the owner of the Property. TR II, 78:1-11. According to Leo's "Emergency Response Report," the sheen coming out of the drain was so light that it could not be picked up with absorbents. Leo also noted that the oil-water

separator on the Property showed "below concern levels for TPH," and he suggested to the owner to have the separator pumped off and keep better track of it. TR II, 78:4-22. Leo concluded that no further action was needed at that time. TR II, 78:21-22.

Following another complaint [apparently made to the EPA] by Paolino in April 2014, Pat Hogan ("Hogan") from RIDEM inspected the outfall on April 15, 2014, noting that it had been raining lightly and steadily for hours; no flow was coming from the smaller pipe and only an extremely low flow from the larger pipe; and the flow was "clear, no color, with no visible oil sheen or turbidity." TR II, 84:19-85:7. Hogan returned the following morning when the flow from both pipes was still clear. Although turbid stormwater runoff was conveyed by the recently constructed paved drainage swale, no oil sheen was visible and the stream clarity was not being impacted by the runoff. TR II, 85:3-13. All information in Hogan's report from that occasion was forwarded to Paolino, informing him that "[g]oing forward, DEM will continue to accept any complaints that you may wish to submit. However, your complaints (along with any other complaints submitted by the public) will be inspected according to priority and resources available at the time." TR II, 85:14-20.

In 2013, Paolino filed suit against RIDEM in Rhode Island state court seeking a writ of mandamus, to which he later added

the Defendants as parties. TR II, 87:6-90:1.

### 7. David Holzinger

David Holzinger ("Holzinger"), operations manager for LKQ since 2005, described the process of auto recycling at the LKQ facility. Incoming cars are held in a holding area until they are dismantled, at which time the fluids are removed from the vehicles. Motors and transmissions are then stored or sold, and the hulks (without fluids) are taken to the back of the facility. TR II, 106:25-107:12. Any wastewater from a contained parts washer on-site is pumped into 255-gallon indoor vats and then pumped out by the Safety-Kleen Corporation. TR II, 105:13-106:22.

According to Holzinger, he collects stormwater samples every quarter within the first thirty minutes of a stormwater discharge at "Outfall 1," (if he fails to do so, he is required to note why a sample was not collected within the first thirty minutes). TR II, 108:20-109:15, Ex 15 at Page 9 of 37 ¶ 5.1. Outfall 1 is located where the water mixes with the intermittent stream and before it flows underneath Curran Road. TR. II, 107:17-20. The initial sampling location is near the pond shared by the two properties and the final sampling location is on Leroy Road across Curran Road. TR II, 108:7-19. Holzinger also took quarterly samples at the base of the two outfall pipes, where runoff from the Property mixes with runoff from Curran Road, and

sent them to RELCO Engineers ("RELCO"), an environmental engineering and consulting firm. TR II,111:24-112:9, 113:7-14.

Holzinger noted that, in the time he had been at LKQ, he had never seen a spill at the facility. TR II, 116:5-6. He also testified that LKQ spent close to $1 million on the stormwater management system and that it continued to make improvements to the system to keep turbidity of the runoff in check. TR II, 128:22-129:4.

In order to be compliant, turbidity at the downstream sampling area is required to remain within 5 NTUs (nephelometric turbidity units) of the upstream sampling result. TR II, 131:15-132:1. As set forth in the RELCO report for 2011, Ex. 12, compliance ranged between 0% (February) and 94% (May) during the first half of the year and between 0% (July) and 96% (October) during the second half of the year. Ex. 12 at 3-4. Holzinger conceded that he did not always report the reasons for not taking runoff samples within thirty minutes, as required. TR II, 142:9-23. Holzinger also explained that, in order for the intermittent stream to be flowing, significant rain was necessary before he could collect a sample. TR II, 147:8-14.

### 8. Robert Yabroudy

Robert Yabroudy ("Yabroudy") has been the business manager for Ferreira and his companies for 31 years; however, as Yabroudy

explained, he has not been responsible for environmental matters. TR III, 3:14-4:7. On June 15, 2006, Yabroudy signed an application for a RIPDES permit that named the Trust as the current owner of the Property and Advanced Auto Recycling ("Advanced Auto") as the current operator. TR III, 6:1-7:2. As Yabroudy explained, Advanced Auto was actually dissolved in 2005 and the Property was conveyed to JF Realty at the time. TR III, 7:15-19, 8:4-8. In other words, the information on the application (which, according to Yabroudy, was filled in by Karen Beck from Commonwealth Engineers) was outdated. The application was submitted after RIDEM issued a Notice of Intent to Enforce ("NIE") to Advanced Auto in March 2005, in which RIDEM requested Advanced Auto to (1) install temporary controls to prevent stormwater runoff and (2) apply for a RIPDES permit. Ex. 4.

Because the RIPDES permit required a stormwater pollution plan control, TR III, 16:1-4, Yabroudy contacted RIDEM and retained an engineer, TR III, 25:25-26:7; he also stayed in communication with RIDEM and functioned as the pollution prevention team leader. TR III, 16:14-17:5. The stormwater management system installed on the Property included two outfall pipes set in the headwall facing Curran Road. Outfall 1, the

larger pipe, carries water from the impervious[7] surface areas (roughly five acres on the Property); Outfall 2 drains an additional area that was not covered by Outfall 1. TR III, 22:1-22. Underground are large detention basins that collect water and let contaminants settle to the bottom, which results in cleaner outflow. TR III, 22:23-23:2. The system, which was completed in 2008, also includes an underground oil/water separator. TR III, 23:3-10. Sampling of the water outflow was delegated to Holzinger, who made reports to RELCO, which, in turn, made quarterly reports to RIDEM. TR III, 26:14-27:8.

After RIDEM sent a letter to Yabroudy on September 23, 2010, noting that it had come to RIDEM's attention that the Property had changed ownership, Ex. 9, LKQ sent a letter to RIDEM, requesting a name change to the RIPDES permit. Ex. 10. According to the October 14, 2010 letter, LKQ was the current operator/owner of the Property; Ferreira, the "previous responsible party" for Advanced Auto, remained as general manager of LKQ. The letter also stated that the Trust "hereby transfer [sic] the above referred permit on October 28, 2005." Ex. 10.

In sum, Yabroudy's testimony (presented both in the Plaintiffs' case and on behalf of the Defendants) established

---

[7]

    Impervious surface refers to artificial structures such as paved areas, driveways, rooftops, which are covered by impenetrable materials.

that, while the Trust may still have been the owner of the Property when RIDEM became involved in 2004/2005, the Property was conveyed to JF Realty in 2005 and was operated by LKQ, not Advanced Auto. Although RIDEM was apparently not properly notified of the change in ownership or operator identity, correspondence and documents from RIDEM indicate that RIDEM was aware of the changes. *Inter alia*, a 2007 telephone deficiency note reflects "JF Realty, LLC (formerly Joseph Ferreira Trust) as the file name, Ex. 5; a 2007 "Insignificant Alteration Permit" is addressed to JF Realty, LLC, Ex. 7; and a 2010 NOV was issued to JF Realty LLC. Ex. 8. All those documents precede RIDEM's September 2010 notification to the Trust that the transfer of ownership and change in operator was not in RIDEM's files. Ex. 9. In response to RIDEM's notification, LKQ and Ferreira promptly (if perhaps inadequately) requested a name change to the RIPDES permit, asserting that "[t]here will no name change in the day to day operations; it will be business as usual." Ex. 10.

As recounted by Yabroudy, in late 2005, Paolino requested that Yabroudy offer the Paolino Property to Ferreira for purchase and quoted a price of $250,000. After Yabroudy "vehemently" declined the offer, Paolino said that Ferreira would "regret" it. TR VII, 42:12-43:13.

### 9. Joseph Ferreira

Ferreira, who purchased the Property in 1983, is LKQ's plant manager in charge of purchasing cars for recycling. TR III, 52:11-14. Ferreira had no direct involvement with RIDEM, although he was aware of the 2005 RIDEM notice requiring a RIPDES permit. TR III, 37:19-25, 39:6-11, 41:2-8. At times, Ferreira was briefed by Yabroudy, who dealt with the engineer regarding the permit issue. TR III, 41:9-18. Ferreira knew that there was contamination on the Property, TR III, 46:23-25, and that work was necessary to address that issue. TR III, 47:10-15. Ferreira also briefly described the installation of the stormwater management system, TR III, 43:21-44:8, but he was unclear on the specifics of parts of the system or particular events related thereto. In sum, Ferreira relied on Yabroudy or other employees to attend to the details of the RIPDES permitting process and he generally assumed that all necessary work was done. Accordingly, Ferreira's testimony did not provide any support for the Plaintiffs' claims.

### 10. Dr. Roseen

Following a presentation of the parties' respective positions on the Defendants' motion to strike Plaintiffs' untimely expert report (Dkt. No. 57), the Court advised the parties, for reasons stated in open court, that Dr. Roseen would

be permitted to testify only to his observations and conclusions contained in the initial disclosures provided in his first report. As the Court noted, the Plaintiffs

> "didn't engage an expert until sometime in the very month that those disclosures were due; and then once you had the opportunity with the expert to go on the property and do what it was that the Court permitted you to do, still even then you went forward to the noticed deposition of that expert and did not, before that date, do anything to apprise the other side that there would be these additional opinions rendered." TR IV, 15:4-12.

Instead, the Plaintiffs filed a motion to serve a revised expert report months after the deadline for expert disclosures had passed and only after the Defendants (in reliance on the Plaintiffs' disclosures as they had been made up to that date) had filed their motion for summary judgment in accordance with the deadline established in the pretrial order.

Dr. Roseen's limited testimony is summarized as follows. Dr. Roseen holds a doctorate in civil engineering with a specialty in water resources engineering. He was not engaged by the Plaintiffs until mid-February 2014, two weeks before his report was due. Dr. Roseen explained, in general terms, the design and functions of the stormwater management plan ("SWPPP" for Stormwater Pollution Prevention Plan) for the Property. TR IV, 104:24-108:24. Dr. Roseen conducted a file review of existing documentation and information relayed to him by a member of his staff who conducted

a site visit on the Paolino Property. TR IV, 111:23-113:5. Using information gained from the site visit (not on the Property itself) and available state data based on LIDAR[8] imagery, Dr. Roseen identified what he believed to be four potential locations of off-site discharge where untreated runoff would occur. TR IV, 113:17-114:10. Dr. Roseen also suggested that a berm "that's constructed, as far as we know ... observed through the topographic analysis with the remote sensing data," surrounding the LKQ site might be overwhelmed in case of substantial water ponding. TR IV, 114:13-25, 115:1-4. Based on the SWPPP design drawings, local soil data, and NOAA (National Oceanic and Atmospheric Administration) rainfall data, Dr. Roseen designed a watershed computer model, essentially reconstructing the stormwater practices on the Property and estimating the site discharges. TR IV, 116:1-14.

Dr. Roseen also reviewed the elements of the 2007 SWPPP, noting that the MSGP (multi-sector general permit, essentially identical to the RIDPES permit) described the need for monitoring every outfall; he acknowledged, however, that the state-approved plan called only for a single outfall to be monitored. TR IV, 123:1-15.

---

[8]

    LIDAR, a portmanteau of "light" and "radar," is a type of imagery that enables topography with very high vertical accuracy. TR IV, 114:5-10.

The 2010 Corrective Action Plan, implemented after the issuance of an NOV to the Defendants, constituted a major upgrade for the SWPPP, including water quality units, underground detention, and storm filters. TR IV, 124:1-14. Dr. Roseen also noted that this type of advanced stormwater management was heavily dependent on maintenance, *e.g.* filter changes. TR IV, 124:11-25. A further revised 2012 SWPPP added primarily measures for turbidity controls to the system, including visual observation at five new observation points and the use of a street sweeper to clean up after daily operations. TR IV, 125:12-153:4. A 2013 SWPPP revised quarterly to semi-annual monitoring. TR IV, 126:16-25.

Dr. Roseen also conducted a review of maintenance records from 2007 through September 2013, but noted that there was a lack of information. According to Dr. Roseen, the MSGP requirements for maintenance records were not available and he was unclear on the capacity for oil-water separators. TR IV, 127:14-15, 21-128:1. According to the documentation, the oil-water separator had never been cleaned and inspection reports were missing. Although the cartridges for Contech storm filter units on the site had been replaced once, there was some discussion of the need for maintenance in the records. TR IV, 128:6-11.

With respect to the berm surrounding the LKQ operations, Dr.

Roseen estimated, using his computer model, how frequently the berm would overtop during a 10-year, 24-hour design storm; his calculations were based on the berm's storage capacity, which he calculated by multiplying the impervious area on the site with a number equating a one-inch rainfall over a certain time period. TR V, 5:12-20, 8:11-24. Dr. Roseen acknowledged that he did not have the actual calculations available to him, but he essentially constructed a model of the berm's treatment capacity based on design drawings and topography information from state GIS (geographic information systems) databases. TR V, 8:11-24. Dr. Roseen noted that the staff member who conducted a visual inspection of the Property from the neighboring Paolino Property observed that the berm did not look as if it would contain runoff and that, on a portion of the Property, the berm appeared to be made of compressed automobiles. TR V, 10:8-12:9. It is noted, however, that this inspection took place in February 2014 and that the observing staff member could not see the dimensions or material of the berm because it was covered with snow.

Because he had no water quantity volume calculations available, Dr. Roseen estimated the size of the water quality units by using the design drawings in the Corrective Action Plan. By calculating a water quality volume for the given area, Dr. Roseen concluded that (1) the berm was insufficient for storage;

(2) the water quality units were also insufficient; but that (3) the underground detention systems were sufficient. TR V, 16:9-23, 20:1-6. Using the EPA Stormwater Management Model, state GIS data[9] for topography and soil type, and the Commonwealth engineering system information, Dr. Roseen performed an analysis he referred to as "continuous simulation." TR V, 22:2-9. According to this constructed model, Dr. Roseen estimated that, based on a five-year rainfall record, the berm would overtop about fifty times per year, resulting in untreated stormwater discharges reaching Curran Brook or various unnamed ponds on the Property. TR V, 22:2-16.

Ultimately, Dr. Roseen concluded that, based on his review of the water quality information, the field perimeter assessment, the review of the maintenance documents, and the analytical analysis of the best management practice performance, "we feel that there is a high likelihood of continued discharge from this facility and that there is repeated discharge at multiple locations to Curran Brook and to ... both in violation of the permit as well as for the Class AA waters [referring to a violation of water quality regulations]". TR V, 38:22-39:8.

As Dr. Roseen acknowledged, the history of the two adjacent

---

[9]
It was unclear which state topography data was used by Dr. Roseen because the specifics were not listed in his report. TR V, 59:18-66:6

properties was environmentally complicated. He was unaware, however, that Paolino had been required to removed 1,100 tons of TPH contaminated soil from his own property. TR V, 43:16-45:16. Dr. Roseen also acknowledged that the Property had a stormwater management system designed and constructed with RIDEM approval and that the system had been subsequently and repeatedly improved. TR V, 47:14-48:9. One of those improvements specifically addressed concerns about turbidity for which RIDEM had issued an NOI. TR V, 50:3-14. With respect to the February 2014 site visit conducted by one of Dr. Roseen's staff, Dr. Roseen acknowledged that there was a foot of snow on the ground on that day. TR V, 53:17-22. The field notes generated from that visit specifically state that the dimensions of the berm and the berm material could not be observed because there was no access to the Property and the berm was covered with snow. TR V, 56: 7-24.

Regarding the conceptual model Dr. Roseen created—which led him to the conclusion that the berm would overflow up to fifty times each year—it appeared that Dr. Roseen applied the standards set forth in the 2010 Rhode Island Design and Installation Manual to the specifications of a system that was constructed in 2007/2008. TR V, 81:16-84:11. The calculations by which Dr. Roseen arrived at the estimated volume of untreated stormwater

runoff in a five-year continuous simulation were not included in his report. TR V, 90:19-93:9. As Dr. Roseen acknowledged, he never confirmed with anyone whether the berm—which his model predicted would overflow an estimated total of 253 times in five years—had ever overflowed at the site. TR V, 98:6-99:17. Subsequent testimony from several other witness indicated that the berms have never overflowed since the system was put into operation.

For purposes of his February 2014 report, Roseen did not perform any water quality monitoring; instead, he relied on samples collected in 2009 by Snyder and in 2013 by Lee. TR V, 113:2-114:1. As noted before, all of those samples were taken on the Paolino Property, at which point the water had already become commingled with the flow from several sources. Although Dr. Roseen acknowledged that a sufficient number of samples is necessary to provide statistically relevant conclusions, he compared single results of stormwater runoff collected from imprecisely described locations against the national standards. TR V, 119:4-121:4. Moreover, in listing the RELCO monitoring results in his report, Dr. Roseen acknowledged that he listed only those sampling results that were in exeedance of the regulatory benchmark, without including those that were in compliance. TR V, 121:5-122:2.

It was established by Dr. Roseen's testimony that, at the time he submitted his expert report, he had been retained only two weeks prior. As a result, Dr. Roseen's expert report was missing relevant portions, including the calculations on which he based his preliminary conclusions as well as the source materials on which he relied in constructing his conceptual overflow model. None of that information was relayed to the Defendants prior to their opportunity to depose Dr. Roseen and, in the absence of an indication that Dr. Roseen would supplement his report months later, Dr. Roseen's testimony at trial was limited to the originally disclosed information. Because there were large gaps in explaining by what methodology and measures Dr. Roseen had arrived at his findings, and in light of other convincing testimony disputing his findings and conclusions, Dr. Roseen's testimony fell short in supporting the Plaintiffs' claims.

**11. Patrick Hogan**

Patrick John Hogan ("Hogan") is in charge of supervising the RIDEM Water Pollution and Septic Enforcement Program. TR IV, 17:3-11. Hogan visited the Property on March 5, 2008, after RIDEM had received two complaints from Paolino regarding turbid discharge at the site. TR IV, 19:11-21. The inspection report generated after that visit, Ex. E, pages 1-3 only, states that there was a light oil sheen on the pooled water and it notes that

the sheen's source was unclear because stormwater runoff from the Property and Curran Road drained to the same area. Ex. E at 1. Hogan's inspection of two areas near the pond at the rear of the Property and at the intermittent stream revealed no visual or olfactory evidence of auto fluids, nor did Hogan see any evidence of oil or other auto fluids draining into the stream. TR. IV, 21:21-23:11. Following this visit, Hogan sent an NOI to the Trust on April 9, 2008, informing it that the inspection had revealed the discharge of turbid water and petroleum staining on an exterior wall and a section of pavement. Ex. F at 1. The NOI also set out six specific steps for the landowner to take in order to address the problem. As Hogan confirmed, the Trust worked with RIDEM in the following months to institute the steps set out in the NOI. TR IV, 26:6-13.

By letter dated April 16, 2008, Hogan responded to various complaints Paolino had made to RIDEM. Specifically, Hogan informed Paolino that RIDEM had performed a multimedia[10] inspection at the Property on March 5, 2008; that riprap had been installed in accordance with a RIDEM freshwater wetlands permit; that no solid waste in excess of regulatory limits had been found; and that Paolino's complaint about water being discharged

---

[10]

    As Hogan explained, the term "multimedia" is used within RIDEM to indicate that staff from different RIDEM programs were present at the site inspection. TR IV, 28:1-4.

onto his property was unfounded because the discharge occurred in the right-of-way associated with Curran Road. Ex. G, TR IV, 27:24-30:18. Hogan noted that a prior complaint by Paolino about a building protruding into wetlands had already been addressed and that no violation had been found. TR IV, 30:19-31:3. Hogan also provided a copy of the NOI to Paolino. Ex. G at 1.

On November 20, 2009, following a significant rainstorm, Hogan made another inspection at the Property.[11] On that occasion, the measured turbidity difference between upstream and downstream water flow was 5.2 NTUs (just slightly above the Rhode Island standard of 5.0). TR IV, 32:16-33:10, Ex. T. RIDEM issued a Notice of Violation, which was eventually settled by JF Realty after payment of a $2,670 administrative penalty. TR IV, 34:20-3535:25, Ex. 13.

In July 2010, Hogan wrote to the Cumberland town solicitor to address concerns voiced by the Town regarding the Property. Ex. W-1, TR IV, 37:20-38:11. Hogan informed the Town as follows:

> Since September 2007, DEM has received numerous, repeated complaints from an adjacent landowner, Mr. Louis Paolino, regarding alleged wetlands, solid waste, oil pollution and water pollution violations dating back to the 1980s. The most recent complaint was submitted on June 23, 2010. DEM thoroughly investigated each complaint and determined all but one to be

---

[11]

Hogan explained that the inspection was prompted by another complaint and that the date was chosen because there had been a good rainfall. TR III, 33:11-23.

unfounded.

Hogan noted that RIDEM had found one violation related to the discharge of turbid stormwater runoff from the Property to Curran Brook, which prompted RIDEM to issue a NOV that included an order to control the violation and to pay an administrative penalty for noncompliance. Ex W-1, TR IV, 39:17-40:8.

Hogan performed two additional site inspections of the Property in April of 2014. TR IV, 40:21, Ex. FF, Ex. GG. The April 15, 2014 inspection showed no or little flow from the two outfall pipes in the headwall, and the flow in the stream was clear with no visible oil sheen or turbidity. Ex. FF, TR IV, 40:21-41:4. Hogan returned the following day after it had rained overnight. Ex. GG. On this occasion, he noted that there was clear flow from the outfall pipes. Hogan noticed that there was a newly constructed paved swale to discharge road runoff into the new riprap-lined drainage swale. The water in the newly paved swale (which is upstream of the two fallout pipes) was turbid and brown, but free of any oil sheen. In other words, the turbidity in the riprap swale appeared to be generated from the paved swale that discharged runoff from Curran Road. Ex. GG, TR IV, 45:9-46:18.

Hogan also explained that the samples taken by Snyder, Paolino's hired consultant, were of no use to RIDEM because the

source of the samples was not clear. TR IV, 77:15-78:10. According to Hogan, a sampling result of petroleum in surface water samples was not necessarily a violation, when it was unclear whether the samples were taken in the receiving stream, the plunge pool, or the discharge channel. TR IV, 77:10-78:18.

In sum, Hogan's testimony established that he conducted at least four personal inspections of the Property, prompted, at least in part, by Paolino's complaints to RIDEM. For the most part, the complaints were deemed to be unfounded; in the sole instance where a violation was found, RIDEM issued an NOV and levied an administrative fine on JF Realty. Hogan kept Paolino informed of RIDEM's responses to the complaints and he also addressed the concerns expressed by the Town of Cumberland regarding the Property. It is noteworthy that, in addition to determining that there were no violations on the Property (with the exception of a finding of turbidity), Hogan also advised Paolino in April 2008 that the discharge point was relocated to "the southwest corner of the Property at the border with the right-of-way associated with Curran Road," and that the stormwater was <u>not</u> being discharged onto Paolino's property.

**12. Karen Beck**

Commonwealth Engineering employee, registered landscape architect, and wetlands scientist Karen Beck ("Beck") provided

the most understandable and cohesive description of the stormwater management system design and construction on the Property. Beck worked on the design, obtained the necessary permits, and coordinated efforts by Commonwealth's engineers. TR VI, 20:19-23. As already established, the Property has a known complicated history—as does the property owned by the Plaintiffs. In order to obtain RIPDES and Freshwater Wetlands permits for the Property, the Property owners hired Commonwealth in 2005. Commonwealth collaborated with RELCO, which specializes in stormwater testing and water quality issues. TR VI, 21:4-22:1. RIDEM had provided specific directives regarding the system, requiring the Property owner to control aluminum, lead, oil and grease, and iron. Both permits also required treatment for total suspended solids. TR VI, 22:4-17.

At first, turbidity was not an issue that RIDEM required the Defendants to address. TR VI, 23:5-9. The initial drawings for the stormwater management system were amended three times through 2007 and were eventually approved by RIDEM when the plans were submitted in support of the RIPDES permit application. TR VI, 27:6-18. Work on the system began in 2007. TR VI, 27:23-25. For temporary sediment control, riprap and silt fencing were installed at the site. After construction was nearly completed, RIDEM issued an NOI, raising, for the first time, a concern about

turbidity. TR VI, 28:1-17. RIDEM records show that a conversation regarding the turbidity issue took place between Beck and Hogan in December 2008. Ex. N.

In August 2008, Commonwealth's engineers certified that the site was constructed as per the approved plans. TR VI, 30:12-15. Ex. J. Following that certification, Commonwealth proposed additional turbidity controls which were approved by RIDEM. Ex. P, TR VI, 31:12-18. Although RIDEM initially set the turbidity standard at 10 NTUs above background, that standard was lowered to 5 NTUs because the water eventually drained into a drinking water supply. TR VI, 32:15-22. Subsequently, RIDEM issued an NOV for a turbidity reading of 5.2. TR VI, 33:16-21. Commonwealth then suggested additional methods to address the turbidity issues by preparing, together with RELCO, a Corrective Action Plan that included additional trench drains, riprap areas, and pavement areas. Ex. 11; TR VI, 34:1-14. The plan was approved by RIDEM. TR VI, 34:15-25. According to Beck, who participated in the implementation of the plan and was personally present at the site during the installation of some of the measures, all proposed actions and facilities were instituted at the site. TR VI, 35:1-19, 36:11-37:15.

In order to direct the downhill flow of stormwater into the water quality treatment system, two berms were constructed on the

site. TR VI, 38:19-23. The berms were made from compacted "clean fill," approximately one and one half foot in height and of varying length. TR VI, 38:5-17. Beck explained that the berms were designed to direct the flow of the water, not to filter or to contain it. TR VI, 41:5-17. In other words, the berms were not intended to hold the water, just direct its downhill flow and lead it to the stormwater management system. TR VI, 41:14-17. Beck also noted that any component of the site that Dr. Roseen's staff believed to be constructed of crushed cars was not part of the stormwater design. TR VI, 39:3-14. In response to Dr. Roseen's computer model—which anticipated that the berms would overflow 253 times in a five year period—Beck confirmed that, during at least two dozen visits she made to the site, including during or after a rainfall, she had never seen any of the berms overflow. TR VI, 39:21-40:23.

To design the system, Commonwealth used aerial photogrammetry, *i.e.* photographs taken from a plane together with computer models, in order to generate site-specific topography, including buildings, catch basins, rocks, trees, etc. TR VI, 42:9-43:8. Beck explained that this method, utilizing a two-foot interval, was more precise than the state database used by Dr. Roseen, which utilized a five-foot interval. TR VI, 43:9-17.

Beck also noted that the "untreated runoff" referred to in

42

Dr. Roseen's report related to a wooded area, where treatment of stormwater was not required under Freshwater Wetlands or RIPDES regulations. TR VI, 43:18-44:7.

With respect to the system installed at the site, Beck provided a detailed overview of its design and function, TR VI, 44:14-58:4, noting that no options for the site existed that were more technologically advanced than the system that was installed. TR VI, 58:1-3.

To summarize briefly the operation of the system, rainwater runs down the hill from the rear of the site; it is then directed by two berms; it crosses areas of gravel, riprap and pavement, and enters two trench drains, which are long rectangular underground structures with a grate on top. The water then enters Hancor water quality units that consist of four-foot diameter pipe with a series of baffles along the length of the pipe which trap any oil in the waterflow. The drainage calculations necessary to remove 80% of total suspended solids (as required by RIDPES and RIDEM) were submitted to RIDEM, which reviewed and approved them. The Hancor units also contain a coalescer, an intricate plastic unit that retains and removes additional particles from the water. The water is then discharged into the subsurface extended detention system, a number of parallel 48-inch diameter pipes with a controlled outlet structure, in which

the water is detained for a minimum of 36 hours, during which time all of the solids are settled out. At some point, one of the Hancor units was removed and replaced with four Contech units, a change that was coordinated with and acceptable to RIDEM. TR VI, 75:11-76:18.

In addition to the primary structure on the site, a secondary structure was installed for larger storm events, including a vertical rectangular weir and a series of four catch basins with Contech filter units that control the discharge of larger water flow, which eventually flows through the smaller pipe set in the headwall facing Curran Road. There are also separate trench drains without outlet pipes, which are designed to trap sediments present in the water.

Beck acknowledged that no property boundary survey had been done prior to commencing the work and that the location of a planned headwall had to be moved because it was protruding onto the Paolino Property. TR VI, 61:6-14, 62:20-23. According to Beck, Commonwealth designed and installed the system; however, the company had no role in the required maintenance. TR VI, 68:23-69:3. Beck noted that, although she saw some maintenance reports, she did not personally know whether all required maintenance had been performed because Commonwealth had not been tasked with that responsibility. TR VI, 69:4-24. Beck also had no

involvement in monitoring the site for turbidity or in selecting the locations for turbidity monitoring. TR VI, 74:3-17.

### 13. Richard Lavengood

Richard Lavengood ("Lavengood"), an engineer and certified toxic use reduction planner, is the principal of RELCO Engineering, which specializes in assisting businesses in complying with state and federal regulations, including EPA and RIDEM. TR VI, 86:6-25. Lavengood works with more than a hundred auto recycling facilities on stormwater pollution prevention. TR VI, 87:13-17.

RELCO prepared a stormwater management plan for LKQ in order to bring it into compliance with the Rhode Island stormwater regulations. RELCO then filed a Notice of Intent with RIDEM, requesting a permit to do the necessary work. TR VI, 88:4-13. The plan developed by RELCO included testing, training of personnel, and dealing with incidents. A team of RELCO and LKQ members is responsible for implementing the plan. TR VI, 89:1-4.

According to Lavengood's uncontroverted testimony, unlike LKQ, most facilities of its kind have no treatment systems and some of them have only a third of the measures which LKQ has instituted; none of Lavengood's clients have ever spent $1 million on stormwater treatment. Lavengood summarized the steps in the automobile recycling operation, TR VI, 89:14-90:20, which

was essentially consistent with the description provided by David Holzinger. Lavengood also explained that the crushed cars described by Dr. Roseen were placed alongside the earth berms in order to protect the berms from traffic on the site. TR VI, 91:2-15.

Lavengood's first involvement with LKQ stemmed from RIDEM's issuance of an NOI to the Defendants, which required LKQ to install a stormwater treatment system. TR VI, 91:16-92:1. RELCO prepared the SWPPP (Stormwater Pollution Prevention Plan) detailing how LKQ would comply with RIDEM regulations. TR VI, 92:6-12. In 2011, after the whole system had already been approved by RIDEM, RIDEM called for turbidity assessment. TR VI 93:4-15. In response, RELCO created a turbidity monitoring program, which included investigating possible sources of turbidity and eliminating or minimizing them. TR VI, 93:16-24. As part of that effort, LKQ paved roads, planted grass on hill sides, installed riprap, built secondary trenches, placed large coconut pads in the bottom of all slit trenches, purchased a street sweeper to eliminate dust from the pavement, placed terra logs in the outputs to collect dirt and particles, and filled six-foot-deep trenches with crushed stone to prevent erosion. TR VI, 95:2-96:23.

By letter dated August 24, 2010, Holzinger informed Pat

Hogan at RIDEM of the modifications LKQ was implementing at the Property in order to address the turbidity problem. Ex. X. The implementation of additional measures took about a year, after which Lavengood informed Pat Hogan at RIDEM that significant improvements had been made. Ex. BB. Lavengood sent a further progress report to RIDEM in February 2012. Ex. CC, TR VI, 98:14-99:12.

Pursuant to RIDEM requirements, RELCO continues to perform quarterly monitoring of the system and quarterly inspections at the Property, and it prepares an annual report for submission to RIDEM. TR VI, 105:25-106:9; Ex. II, Ex. KK. Lavengood, who personally participated in annual and quarterly inspections, in the course of which he also interviewed LKQ representatives, testified that there had been no instances in which the stormwater overtopped the berms. TR VI, 109:18-110:18. As part of his inspections, Lavengood determines whether any parts of the systems require maintenance or cleaning and, as documented by a number of invoices submitted in evidence, the long underground pipes have been cleaned out and a remote-controlled camera has been used to determine whether Lavengood's determination that cleaning was necessary was, in fact, accurate. TR VI, 113:2-114:15. Lavengood was personally present on that occasion and the system was subsequently cleaned. TR VI, 115:15-116:5. Lavengood

was also present during the cleaning of the Contech units. TR VI, 116:15-20. Lavengood noted that, although monitoring is required only once per quarter[12], monitoring at the site was done voluntarily four or five times per quarter, particularly after a rainfall, so that turbidity problems could be brought under control immediately. TR VI, 118:5-17.

Lavengood explained that, as outlined by EPA and adopted by RIDEM, auto salvage yards sample their outfalls for iron, lead, aluminum and total suspended solids, plus oil and grease per RIDEM. TR VI 122:10-18. LKQ is also required to sample for turbidity. TR VI, 122:19-22. RIDEM uses EPA benchmarks for all but turbidity, which is a RIDEM benchmark. TR VI, 123:5-9. Lavengood further explained that an exceedance of a stormwater regulation does not constitute a Clean Water Act violation. Rather, the exceedance of a benchmark requires a response within a two week period to address the exceedance. TR VI, 123:20-124:1, 124:8-25, TR VII, 7:15-8:3.

Lavengood acknowledged that, on several occasions, LKQ did not meet the turbidity benchmark, but he noted that those results did not signify that LKQ was not in compliance; rather, a

---

[12]

Lavengood noted that quarterly sampling had only been instituted in November 2013; prior to that time, sampling was done in alternate years and/or depending on the results of prior sampling. TR VII, 3:15-4:20.

response to the exceedance was required. TR VII, 16:4-21. Each of the five analytes at issue has a different benchmark and if any one of them exceeds the respective benchmark by more than four, a Corrective Action Plan must be prepared. TR VII, 17:10-25. That plan remains onsite until the results are reported to RIDEM at the end of the year, at which point RIDEM may declare a violation. TR VII, 18:1-24.

## IV. Discussion

### A. Dismissal of CWA Claims in State Court

In their post-trial memorandum (as in their motion for summary judgment, Dkt. No. 49, and their motion *in limine*, Dkt. No. 89), the Defendants assert, *inter alia*, that the Plaintiffs' CWA claim is barred because all claims brought against the Defendants under the CWA were dismissed with prejudice in the state court action in May 2012. In response, the Plaintiffs offer an affidavit by one of their counsel who states that, although he had no conversation with Defendants' counsel or the state court judge regarding what effect the stipulation of dismissal would have on the CWA action pending in federal court, "it was [his] understanding that the Clean Water lawsuit then pending in Federal Court would continue unaffected by the Stipulation of Dismissal." Bonin Affidavit, Dkt. No. 93-1. No other documentation was submitted to support the Plaintiffs'

49

understanding of the effect their voluntary dismissal would have.

It is undisputed that CWA claims in the state action,[13] which involved the identical parties and the same facts as this case, were dismissed by written stipulation <u>with prejudice</u>. Ex. NN. Likewise, it is undisputed that the Plaintiffs first brought CWA claims in state court in November 2009, (which were removed to this court and then dismissed without prejudice) and that Plaintiffs again asserted CWA claims in state court in January 2010 and March 2012, while reasserting CWA claims in this Court in June 2011 (which they voluntarily dismissed without prejudice) and in January 2012.

In other words, the claims asserted in the state court action precede, at least in part, the CWA claims raised in this Court. Moreover, the Defendants are correct in pointing out that the Plaintiffs voluntarily dismissed their claims under the CWA twice: once in this Court, without prejudice, in August 2011, and once in state court, with prejudice, in May 2012.

Pursuant to Rule 41 of the Federal Rules of Civil Procedure, "[u]nless the notice or stipulation states otherwise, the

---

[13]    The Court notes that the state court complaint refers throughout to the "Federal Water Pollution Act," not the CWA. The Federal Water Pollution Control Act, enacted in 1948, has been commonly known as the CWA since it underwent significant reorganization and expansion in 1972. <u>National Pork Producers Council v. U.S.E.P.A.</u>, 635 F.3d 738, 742-43 (5th Cir. 2011).

dismissal is without prejudice. But if the plaintiff previously dismissed any federal- or state-court action based on or including the same claim, a notice of dismissal operates as an adjudication on the merits." Fed. R. Civ. P. 41(a)(1)(B).

Counts XXVIII through XXX of Plaintiffs' second amended 35-count state court complaint—which is not a model of clarity—assert violations of the "Federal Water Pollution Act"; Count XXXI asserts a violation of the Rhode Island Water Pollution Act.[14] The factual assertions in all four counts are identical: the Plaintiffs allege that each of the Defendants discharges contaminated waste and/or hazardous waste into a brook that ultimately flows into Providence Harbor. Ex. MM ¶¶ 142, 147, 152, 157. By contrast, the Complaint in the instant case is significantly more comprehensive and includes allegations of contamination on the Paolino Property, uncorrected turbidity problems, and irregularities in permitting.

Although it is likely that the state court claims overlap, to some degree, with the claims asserted under the CWA in this Court, it is unclear and the Court cannot say with certainty, that the claims in this case are identical to those raised in the state court action. However, that determination is of no

---

[14] Count XXVIII is specific to LKQ; Count XXIV relates to Ferreira, d/b/a Advanced Auto;, Count XXX relates to the Trust; and Count XXXI relates to LKQ as well.

consequence to the outcome in this case because the Court has concluded that the Plaintiffs' CWA claims in this case fail on the merits.

**B. The CWA Claim**

Although the CWA generally prohibits the discharge of any pollutants into navigable waters, see 33 U.S.C. § 1311(a), the discharge of such effluent is permissible if it is authorized by a valid NPDES (National Pollutant Discharge Elimination System) permit or, in this case, a RIPDES permit issued by RIDEM, the authorized state permitting agency. 33 U.S.C. § 1342. In addition to state and federal enforcement of the CWA, a private citizen "may bring a civil enforcement action in federal district court against an NPDES permit holder for failure to comply with that permit's conditions." Paolino v. JF Realty, LLC, 710 F.3d at 35. To support their citizen suit under the CWA in this case, the Plaintiffs were required to prove that the Defendants discharged a pollutant from a point source into navigable waters without a permit. 33 U.S.C. §§ 1311(a), 1342(a), 1362(12), 1365(a)(1), and 1365(f)(1).

None of the testimony offered by the Plaintiffs served to establish that the Defendants were in violation of the CWA. It is undisputed that a RIPDES permit was issued with respect to the Property. The Defendants' efforts to bring the Property into

compliance with the conditions imposed by RIDEM prior to issuance of the permit, as well as the additional and extensive measures taken by the Defendants to comply with the permit's conditions were well documented and submitted at trial.

Both properties involved in this dispute have a long and checkered environmental history. Together, the properties were operated as a pig farm and an unlicenced dump for both solid waste and chemicals; the properties were also periodically strip-mined. During the 1970s, RIDEM first stepped in and began to regulate the properties.

In 2005, RIDEM required the owner of the Property to develop a stormwater management plan. In response, over the course of several years, a stormwater management system was designed and approved by RIDEM, as was the construction of that system. In 2007, RIDEM issued a RIPDES permit to the owner[15] of the Property; subsequently, the system was amended and approved several times.

After RIDEM issued an NOI regarding turbidity issues, a Corrective Action Plan was developed in 2010 and approved by

---

[15]

It is noted that, although the RIPDES permit was issued to the Trust at a time the Property had already been transferred from the Trust to JF Realty, both entities were controlled by Ferreira. Ferreira was also in control of the entities that conducted automobile recycling on the Property. This Court's fact finding or analysis is not affected thereby. See Section IV. D. herein.

RIDEM. By all accounts, as a result of RIDEM's continuous involvement in the Property, and with RIDEM's approval of both the design and construction of the system, JF Realty, with the help of Commonwealth and RELCO, installed a comprehensive (and costly) stormwater management system on the Property. The system was specifically designed to address all of RIDEM's concerns and bring the Property into compliance with environmental regulations. Although turbidity had not been an issue at the inception of this process, a multi-faceted approach was taken by Commonwealth and RELCO to improve turbidity in the stormwater runoff. To the extent the frequent sampling showed an exceedance of turbidity standards, the results were duly recorded and responded to with additional measures. It is also noted that such exceedances did not constitute a violation of the CWA or noncompliance with state regulations *per se*; rather, they required a response to address the findings.

In the interim, in 2006, shortly after his offer to sell his property to Ferreira had been summarily rejected, Paolino commenced litigation against the Defendants. After his federal claims were dismissed (without prejudice) and his state-based claims remanded to state court, Paolino proceeded to trial in the state court, while reinitiating CWA and trespass claims against

the Defendants in this Court.[16] Paolino dismissed the majority of

his claims in state court with prejudice (including any claims

brought against the Defendants under the Clean Water Act and any

claims related to the two parcels he had previously sold to the

developer). State Court Complaint, Counts XXVIII-XXXI, Ex. MM;

Stipulation, Ex. NN. Eventually, the state-based case, now

reduced to several trespass claims, was tried before a jury,

which awarded total nominal damages of $1,400 to Paolino. Ex. 16.

Following Paolino's motion for entry of final judgment, the state

court denied Paolino's claims for injunctive relief, with the

exception of the removal of a portion of a metal building

encroaching on the Paolino Property. Ex. OO. The state court

specifically rejected Paolino's demand that the Defendants

"return the site to its previous condition prior to installation

of the stormwater system," finding that "the surface water flow

is consistent with the historical drainage pattern, [and] the

impact to the Plaintiffs is *de minimis*." Ex. OO at 2. This

finding is consistent with RIDEM's conclusion, following a

---

[16]

     To summarize, Paolino first filed state-based claims against
the Defendants in state court. After he filed several amendments
and added federal claims, the Defendants removed the case to this
Court. The federal claims were dismissed without prejudice and the
state-based claims were remanded. While the case was pending in
state court, Paolino filed another complaint in this Court, which
he dismissed voluntarily, without prejudice, after which he filed
a third complaint, which is the basis of the instant litigation.

multimedia inspection of the Property in March 2008, that stormwater is not being discharged onto the Paolino Property.

In sum, the evidence and testimony offered at trial establish that the Defendants, with the input and approval of RIDEM, built a state-of-the art stormwater management system on the Property, which was designed to address all aspects of stormwater runoff and to bring the Property into compliance with environmental regulations. The descriptions of the various components of the system, their function, and the additional efforts by the Defendants to bring the turbidity under control were undisputed.

No convincing evidence to the contrary was submitted by the Plaintiffs. The conclusions arrived at by Dr. Roseen, retained by the Plaintiffs only two weeks before disclosure of his report was required, were guided, in part, by observations which a staff member made from the neighboring property, on a day where much of the ground was covered by snow. As a result, there appears to have been some significant misunderstanding of at least some of the components of the system and their functions, *i.e.* the significance of a stack of crushed cars intended to protect the packed soil berms designed to guide the flow of water, not to contain it. Dr. Roseen's computer model also appeared to be based on incomplete data (at least a portion of which was not

referenced in his report), and his prediction of more then 250 incidents of berm overflow in a five-year period was flatly contradicted by the testimony of several witnesses who were frequently present on the Property, and who reported that the berms had not overflowed since the system had been installed.

In order to support their claims against the Defendants and to convince RIDEM to investigate the Property further and/or to send an LOR to the Defendants, the Plaintiffs also engaged professional engineer Alvin Snyder. However, it was undisputed that the samples Snyder collected and sent to RIDEM were not taken at the Property; rather, they came from the area along Curran Road that is fed by at least five separate sources. Accordingly, RIDEM, although it did respond to Synder's report by sending RIDEM staff to the Property, deemed the samples insufficient.

### C. RIDEM's Regulatory Oversight of the Property

As established by the detailed testimony of witnesses, including RIDEM staff, RIDEM was involved with the Property for many years, particularly and frequently since 2005. *Inter alia*, RIDEM issued an Notice of Intent to Enforce ("NOI") to the owner of the Property in March 2005, requiring immediate temporary controls to prevent the discharge of stormwater pollutants and the submission of a RIPDES permit application. Ex. 4. RIDEM next

required installation of a stormwater management system; it approved the design and construction of the system; and it required and approved certain amendments thereto. In April 2008, RIDEM issued an NOI to the Trust, advising it of a water quality violation related to stormwater discharge and imposing an administrative penalty. Ex. 8 at pages 4-6 of 18. Subsequently (and repeatedly thereafter), RIDEM inspected the Property and required a Corrective Action Plan to address turbidity of the flow. In March 2010, RIDEM issued an NOV to the Defendants. In September 2010, RIDEM directed the Defendants to correct the outdated information regarding ownership and operation of the Property. Ex. 9. At the time the complaint underlying this litigation was filed in January 2012, an administrative action by RIDEM was pending against the Defendants and ultimately resulted in payment of an administrative fine. Ex. 13. Following numerous complaints by Paolino to RIDEM directly, to the EPA, and to local authorities, RIDEM investigated the matter repeatedly and informed Paolino that it had investigated his reports and that, with one exception, his claims were without merit. RIDEM also specifically informed Paolino that stormwater was not being discharged onto his property. In response, Paolino filed a complaint against RIDEM in state court, seeking a writ of mandamus to compel RIDEM to "enforce all rules, regulations and

permit conditions" applicable to the Defendants, including "suspension, revocation or termination of permits." Ex. PP at 1-2. Since then, Paolino has sought to include the Defendants as parties to his mandamus action. Ex. QQ.

In sum, RIDEM's involvement with the Property and its key role in causing the Defendants to construct a comprehensive stormwater management system on the Property is undisputed and well documented. Equally well documented is the Defendants' responsiveness to RIDEM's requirements and their extensive efforts to bring the Property into compliance.

### D. Adequacy of the RIPDES Permit

Plaintiffs' insistence that the Defendants are in violation of the CWA because the RIPDES permit was applied for and/or issued to the wrong entity is non-availing. As evidenced by correspondence between RIDEM and the Defendants, the identity of the current owner and/or operator was well-known to RIDEM. Moreover, a change of ownership request for the Property was submitted to the Fresh Water Wetlands Program and, once RIDEM pointed out the lack of updated ownership information to the Trust, the Defendants promptly took steps to correct the situation. At most, their attempt to notify RIDEM of the property transfer failed to meet the technical requirement of RIPDES regulations; however, nothing in the CWA authorizes a citizen

suit for such a technical violation.

**Conclusion**

After considering the testimony of all the witnesses and reviewing the evidence submitted by the parties, the Court finds that the Plaintiffs have failed to meet their burden of proof and that the Defendants have prevailed in this case. Pursuant to the Clean Water Act provisions relative to citizen suits, the Court "may award costs of litigation (including reasonable attorney and expert witness fees) to <u>any prevailing or substantially prevailing party</u>, whenever the court determines such award is appropriate," 33 U.S.C. § 1365(d)(emphasis added). Accordingly, the Defendants, if they so choose, are directed to submit a request for costs and fees within fourteen days of this Memorandum of Decision. The Plaintiffs may then have fourteen days to submit a response to the Defendants' request.

SO ORDERED.

<u>/s/ Mary M. Lisi</u>

Mary M. Lisi
United States District Judge
November 19, 2014